At the Full Commission hearing, the Full Commission granted a motion made by plaintiff to admit into evidence a letter to plaintiff dated 26 July 2001 written by Dr. Ronald W. Benfield.
 ***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Kim L. Cramer, along with the briefs and arguments on appeal. The appealing party has not shown good ground to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing on 21 July 1998 as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. At all relevant times, the employee-employer relationship existed between plaintiff and defendant.
3. The employer was at all relevant times a duly qualified self-insured.
4. The shoulder injuries, which are the subject of IC claim no. 556150, allegedly arose in February 1994. The other injuries, which are the subject of IC claim no. 629032, allegedly arose in June 1993.
5. Defendant submitted medical records from the following providers, which have been received as evidence: (1) Dr. Ronald W. Benfield; (2) Iredell Memorial Hospital, Inc.; (3) HealthSouth; (4) CRA Managed Care, Inc. (5) Outpatient Rehabilitation Center (Dr. W. Curl and Dr. Jack Hurov).
6. Defendant also submitted a videotape depicting positions available and offered to plaintiff.
7. The issue before the Commission is whether plaintiff refused suitable employment such that her benefits should be suspended or terminated.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff was 48 years of age at the time of the hearing before the Deputy Commissioner, having a date of birth of June 20, 1952. She completed high school and nearly two years of college, being only one course short of earning an associate's degree.
2. Prior to working for defendant, plaintiff had done production work for ATT, putting wires on a circuit board. She had worked at Cardinal Care Center, doing housekeeping chores and some patient assistance. She had worked for the Census Bureau, going door-to-door and doing telephone work for six months.
3. Plaintiff began working for defendant as a temporary employee in September 1992. She became a permanent employee for the Defendant Lee Company in February 1993.
4. At the time she sustained the shoulder injury, plaintiff was working for defendant as a Flow Rack Packer. In this position, she picked jeans from the bins and packed them into boxes for shipping. The jeans were picked from bins from three different levels: from floor, waist, and shoulder height. This job requires lifting in excess of ten pounds.
5. In March 1995, Dr. Benfield performed a surgical repair of plaintiff's right rotator cuff. Dr. Benfield continued to see her post-surgery. On January 2, 1996, he released plaintiff for modified light-duty work starting at two hours per day, beginning the next day and gradually increasing her hours.
6. On January 3, 1996, plaintiff returned to a work for a couple of hours as a Return Sorter. In this position, the employee removes jeans that have been returned from the boxes and sorts them by size and style into bins on shelves. The jeans can be removed one or two pairs at a time. This position does not require heavy lifting. This position was consistent with Dr. Benfield's release to light-duty work.
7. Plaintiff complained that she was unable to perform the Return Sorter duties without pain. Katherine Broadhurst, the Human Resources Manager for Defendant, then wrote Dr. Benfield a letter on January 22, 1996, regarding the positions Defendant had available for plaintiff and provided him a videotape depicting these positions. Dr. Benfield reviewed the videotape and noted that the positions, particularly a "tagging" job were appropriate and recommended that plaintiff take advantage of this opportunity to return to work.
8. At that time, defendant had several positions available at the plant that were suitable to plaintiff's restrictions. The Return Sorter position depicted on the videotape was the position originally offered to plaintiff. This position was appropriate and had been approved by Dr. Benfield.
9. Another position, Packing List, was depicted on the videotape. Boxes of jeans are moved down a conveyor belt, while packing lists are printed out from a computer. The employee in this position tears the packing list from the computer print-out, folds it and stuffs the list into a sticky pouch attached to the box of jeans, then slides the box of jeans on down the conveyor belt. No heavy lifting is required and this position is consistent with Dr. Benfield's release.
10. Another position available was that of Folder Pack, where the employee prepares small packages of orders, which will contain 2 or 3 pairs of jeans. The employee will close the small box by folding over the flaps and tucking them and then place a label on the box and put the box on a skid. This position could require lifting boxes that weighed more than 10 pounds. However, since there are approximately eight people working as Folder Packers each shift, assistance would be available for lifting the heavier packages onto the skid.
11. Another position available, and which was offered to plaintiff was sorting UPC labels. This position Dr. Benfield apparently refers to as "tagging." In this position, the employee sorts out and bands together UPC code labels that will be attached to the jeans. This is probably the lightest duty that was available to plaintiff. Plaintiff would be able to sit while doing this task and there was no heavy lifting or overhead lifting involved.
12. Due to plaintiff's reluctance to participate in any duties assigned by the employer, even the UPC sorting, defendant sought further assessment from Dr. Walton Curl, who saw Plaintiff on February 28, 1996. Dr. Curl's assessment and recommendations were consistent with Dr. Benfield's.
13. Dr. Curl found that Plaintiff was at maximum medical improvement and had limitation of motion to her right shoulder. He assessed her with a twenty percent permanent impairment to the right arm. Dr. Curl released her to return to work starting out at two hours per day, working up to eight hours per day, with no overhead work and no lifting over 10 pounds or repetitive use of her right arm. Dr. Curl noted that these were permanent restrictions.
14. When she was released by Dr. Benfield in January 1996 and then by Dr. Curl in February 1996, plaintiff was capable of performing light-duty work with no lifting over 10 pounds, no lifting over her head, and no repetitive use of her right arm. The positions of Packing List and UPC Sorter were both within these restrictions. Plaintiff could also perform the Return Sorter position as long as she was not required to reach overhead, which would appear to be possible, as the highest bins were at shoulder height.
15. Plaintiff refused to return to any of the positions offered to her, including the lightest duty, the UPC sorter job. Such refusal was not justified where both Dr. Benfield and Dr. Curl had released her to light duty and the employment offered was suitable and within her restrictions. Under the circumstances, suspension of benefits is appropriate.
16. As of February 28, 1996, plaintiff had reached maximum medical improvement from her shoulder injury and sustained a twenty percent permanent impairment to her right shoulder.
17. Plaintiff's claim for benefits related to her right hand and elbow and right and left arms allegedly arising in June 1993 was not filed with the Industrial Commission until March 20, 1996, and was not filed within the two years allowed by statute.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's claim for benefits in IC file no. 629032 was not filed within the two years allowed and is barred pursuant to N.C. Gen. Stat. § 97-24.
2. Plaintiff had reached maximum medical improvement and at that time had the capacity to earn the same or greater wages by returning to employment available at defendant's plant. N.C. Gen. Stat. § 97-29;In re Stone v. G G Builders, 346 N.C. 154 (1997).
3. As of February 28, 1996, plaintiff unjustifiably refused suitable employment that was available and offered by defendant. Defendant is entitled to cease payment of ongoing compensation effective at that time. N.C. Gen. Stat. § 97-32.
4. As of February 28, 1996, plaintiff had reached maximum medical improvement and sustained a twenty percent permanent impairment to her right arm for which she would be entitled to compensation pursuant to N.C. Gen. Stat. § 97-31(13).
5. Defendant is entitled to a credit towards the compensation due for permanent impairment to the right arm for overpayment of temporary total disability benefits since February 28, 1996. Therefore it appears that no payment of compensation is due.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant shall pay all expenses incurred by plaintiff for reasonably necessary medical treatment to her right shoulder, which was accepted as compensable in I.C. No.: 556150.
2. Defendant's request to terminate payment to Plaintiff of ongoing compensation benefits for total disability is APPROVED.
3. Plaintiff is entitled to compensation for the twenty percent permanent impairment rating to her right arm, beginning February 28, 1996, the date she reached maximum medical improvement, and continuing for 48 weeks. Defendant is entitled to and is granted a credit for overpayment of temporary total disability benefits since that date.
4. Defendant shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER